Our third case is Taiwan Smart v. City of Miami, Case No. 16-16740. Mr. Andrews. May it please the Court, Forrest Andrews and Kerry McNulty on behalf of the City of Miami. Ms. McNulty and I will be dividing the argument. I will be addressing the 1983 claims as well as the prejudicial evidence that warrants a new trial. Ms. McNulty will be addressing the false imprisonment claim. So you're going to split, make sure you've got the splits of time. You're going to take eight minutes on your initial argument and three for your rebuttal? Correct. And Ms. McNulty will take five minutes, right? Okay, whenever you're ready. The District Court's order denying the City's motion for judgment as a matter of law and granting the plaintiff's motion should be reversed because there was no evidence that the City had a policy or practice of violating individuals' rights by allowing the First 48 to film individuals or their property without consent. The District Court's order, the District Court's finding in this case of a policy was based on the City's access agreement with the First 48. But an important condition of that access agreement was a requirement that the First 48 obtain consent before filming individuals or their property. That demonstrates not deliberate indifference, which is required for municipal liability, but that the City took reasonable measures to protect individuals' rights. So for that reason, there was no policy. I thought there was, no, please go ahead. You said something first, so I defer to you. Okay. I thought there was one of the City's own witnesses who testified, aside from the agreement, and I'm summarizing, this is not a quote, that there was a practice, if not a policy, of letting the show go anywhere and film anything as long as they didn't interfere or get in the way of the investigation. It was not to film anything. It wasn't, because of the access agreement, the First 48 was allowed to be present with the officers, but the- You didn't say that they could film? No, Your Honor. I don't believe that, I think it was Commander Cooper that you're referring to, and it was that based on the agreement, they were to have the First 48 present with them, but I do not believe that any of them said that the First 48 was supposed to film anything. Is it your position that investigators, so long as there's no filming, can take any third party, even though that third party has no investigative purpose, into somebody else's residence in order to watch what the police do? When we're in the context of 1983, we have to look at what the City's action or inaction is. And because the City's policy, in this case, didn't have the direct effect of violating constitutional rights because they took, you remember in this case, the agreement requires the First 48 to get consent. Merely being present doesn't violate the Constitution and didn't cause the violation in this case. It was the filming in this case that caused the violation. And the City did not have a policy of allowing the First 48 to film without consent, nor did it have a practice, as there were no prior similar incidents of this, which a final policy maker had notice of. I know in this case there was filming, and that's what led to the claim, and then the trial, and the ultimate damages. But going back to Judge Duffy's question, you think the police act, let's put the city aside for a moment, you think the police act constitutionally by taking third parties along with them whenever they are running an investigation, performing an arrest, doing a takedown, etc., etc., and go into people's homes, people's businesses, you think that's constitutionally permissible? I acknowledge the Wilson versus Lane case in which the Supreme Court stated that if the third parties are not serving a legitimate law enforcement purpose, then that may be a constitutional violation. I think that this- Well then, if that case was long standing before this agreement was entered into, isn't the city already on thin ice? I don't believe so. I think because that case involved qualified immunity with individual, that a city or municipality was not a defendant in Wilson versus Lane, it was individual officers, the issue was- But the city can no more violate the constitution than an individual officer. Obviously, to hold a municipality liable under Monell, you've got to find a custom practice policy, etc. But the city can't let people, third parties, go into people's homes, no more than an individual police officer can. But I think that this is a unique situation where the city is taking steps by saying, you can't film anybody, you can't violate people's rights. You can't do this without permission. That's what my question was. You think if the city just takes people along without filming that that's okay, constitutionally okay? The facts in this situation, I think so. But even if there was a constitutional violation, there was no policy or practice of allowing this. And there was no policy or practice that was the moving force of a violation because the violation that was created was by the first 48, an independent entity of the city, which the city should not be responsible for because it was not an obvious consequence of this agreement that the first 48 would violate the agreement and not get consent before filming. So is it your, Miami's position that because they had this agreement that shifted to the television program, the responsibility of getting consent, and I don't remember the record, although I'm not going to say I know the record well enough to be unequivocal on this, but was there any evidence of all the consents that the filming company had gotten in each of the instances in which they went in with police officers? There was no evidence of any prior incidents one way or another. And that's another reason why there was no policy in this case, because we have to look at deliberate indifference, which is the city knowing of an obvious risk and disregarding it. And because there were no prior incidences which would put the city policy makers on notice that that first 48 was filming without consent, you can't impute that to the city in order to create liability under Monell. Help me, I'm sorry, are you finished, Judge Duffy? Yes. Okay, help me understand Agent Williams' testimony, because this sounds kind of like a policy to me, where he testifies with respect to arrestees that were charged. If they were charged, he says if they were charged, they would offer, they would get the footage from the video, that's how they would do it, even if he didn't want to do it. What that- Meaning the suspect didn't want to be filmed, that's what it sounds like he's saying. The way that that was explained during the trial was that they would get it from the police department, because the interrogations, they're talking about interrogations, which are filmed by the police department, which are public records. And so the first 48 would go that route to get it as a public record, which doesn't violate the Constitution, doesn't violate any individual's rights. They have no reasonable expectation of privacy in an interrogation room. And so that's what that means. Not that they would go ahead and film anyways, which a final policy maker wouldn't know about. It's that they would just ask for the public record from the city, and that's how they would get it. I thought there was some evidence in the record that they didn't actually get it that way. Am I wrong about that? I don't believe that's the case. I believe that they did get it through requesting it from the city, because the city is the one who maintained the video equipment and the videos, and so they would get it that way. Is there any compliance office that the city of Miami had that looked at the compliance of the 48 hours company to make sure that they were in fact getting the consents that were required? There was not, again, because the city was not on notice that this was something that would occur. The first 48 is a production company that has been in existence for a long time. They have experience with this, and there's no evidence in the record that the first 48 didn't get consents in the past. The only evidence of a violation, if at all, was this case, which under this court's precedent does not constitute a custom or practice. Because a custom or practice has to be pervasive and widespread in order to put the city policy makers on notice. But that requirement comes out of cases generally where police officers are allegedly doing things that the city fathers or mothers don't want them to generally do. Beat up people with excessive force, use deadly force without reason, engage in unlawful searches and seizures, that sort of thing. Because the stuff that you would think is isolated and not part of a government practice. But here, the city enters into a contract. It knows what is going to happen, generally speaking. And do you think the city has any obligation to figure out whether or not that contract is being carried out in a constitutional way or not? I believe the way the case law interprets deliberate indifference is that, of course, but for many things, there probably wouldn't be a constitutional violation. However, the city has to be on notice of a particular incident. And just knowingly disregard the need to train or to do some follow up measures or oversight in an area in which it's obvious. The examples that your honor just gave, I think those are obvious situations where you would want to have some type of oversight. In this case, there's no evidence that the city was aware that there was a need for this, based on that lack of evidence. I see that I'm over my time, there were two other evidentiary issues that I wanted to get to regarding the trial. You can certainly use your rebuttal time if you'd like. I'll give you an extra minute and you can do that. Thank you. After that, you're eating into your rebuttal time. I'll take the one minute, I can do it both together. There's prejudicial evidence that permeated this trial. The polygraph evidence, the plaintiff's willingness to take a polygraph 85 times, combined with the fact that he testified that he took a polygraph and he was released shortly thereafter. The only reasonable conclusion the jury could reach after that is that he took the polygraph and he passed it. Even though that evidence is inadmissible under this court's precedent. Always, always inadmissible? It is, unless there's a foundation that is met. They didn't meet that foundation, and this was the willingness of his, his willingness to take a polygraph. That is inadmissible. And then- Didn't the jury, wasn't there a jury instruction limiting or telling the jury about the purpose for which that polygraph evidence could be used and couldn't be used? That instruction, respectfully, I don't believe was adequate to cure any prejudice because they were misleading and contradictory. The judge instructed the jury that it was admissible to determine the reasonableness of the investigation, but then gave two instructions saying that a polygraph is not admissible and that the police don't have to use it. So I don't think that that adequately cleared the prejudice. You also have the third party confession where a detective was allowed to testify that an inmate told an inmate that he killed these individuals. That's double hearsay for which there is no exception, and we believe that that unfairly undermined the city's substantial rights at trial. And so we would respectfully request complete reversal on the 1983 claims or in the alternative. Given the incorrect, I'll put it that way, testimony of a police official in Mr. Smart's case, how do you think that last issue is prejudicial to you? If one of the reasons he was released from custody and charges were dropped was because one of the city's own did something he shouldn't have done or testified in a way that was not actually accurate. I think that's a separate issue which Ms. McNulty will address shortly, but I think that independent of the detective's testimony, the fact that you can't cure something that was wrong with something that is wrong. And having that prejudicial evidence combined with the third party confession was too prejudicial that an instruction couldn't cure in this case and unfairly undermine the city's right to a fair trial. All right, Mr. Andrews, thank you very much. You've saved your full time for rebuttal. Thank you. Ms. McNulty. Good morning, may it please the court, Carrie McNulty, Assistant City Attorney on behalf of the city. I'm going to address the state law false imprisonment claim. So under Florida law, false imprisonment and false arrest are synonymous torts and either is negated by a finding of probable cause. It is undisputed here that probable cause existed for the drug related offenses. In fact, the district court judge found so and granted summary judgment in favor of the city on the false arrest claim on that basis. However, the false imprisonment claim was allowed to go forward and the water seemed to be muddied a little bit based on an outlier case, Mathis versus Coates, a state law case from the fourth district in which there was a distinguishment made between the torts of false arrest and false imprisonment. To the extent the probable cause which existed at the time of an arrest by the police at some point dissipated or evaporated when the plaintiff's continued detention was no longer valid. In that case, however, there was no judicial process. It was just an arrest of someone who's suspected of DUI. And when they took the person to the police station and did a breathalyzer test, it came back negative. And so the court found that when they later brought their false imprisonment claim, that even though the police had probable cause to arrest them at the time when they pulled them over, because they did seem intoxicated, that since the test came back negative, they no longer had probable cause for the continued detention. And so they had potentially a viable false imprisonment claim for their continued detention past that point of the test coming back negative. In this case, the plaintiff was brought two days after his arrest for a probable cause determination before a judge. When you have a probable cause determination before a judge, it's a facially valid judicial process which severs any false imprisonment claim. The judge found- Only up to that point. From that point forward. No, not if it turns out that all the evidence that, I'll give you a hypothetical, not this case. If all the evidence the government presents at the probable cause hearing is knowingly false, you can't defend on the judge's ruling going forward, right? Okay, let's just be clear. It's not that the evidence was- No, no, no, I'm giving you a hypothetical. I understand. I'm not asking you about this case right now. Okay. Defendant gets arrested. Yes. Under state law, he's in for 48 hours, give or take, and he gets a probable cause hearing. All the evidence the government presents at the probable cause hearing is knowingly and deliberately false. To everyone involved on the government side. Every piece of evidence presented by the government is false. Okay. The judge accepts the evidence on its face, and based on that evidence says, there's more than probable cause to hold you. So I so find, and you remain in custody. Everybody except the poor judge knows, at that moment, and the defense lawyer know at that point in time that all that evidence is false and fabricated. You're telling me that that order precludes as a matter of law, a false imprisonment claim going forward until that misconduct is figured out by somebody? Yes, under the case law. Under the case law, it depends on who knows that it's false. If the- The officials who are trying to put him in jail know it's false. But if the judge doesn't know, then it is facially valid judicial process. That is clear under the case law. The same, so analogizing to a search warrant. There's no liability for a search warrant if the police officer lies in the probable cause affidavit, gets a warrant, and then carries out the search, but knows that everything he or she presented was just a flat out lie? Okay, so that's a distinguishable case. And that's actually, the cases relied on by the plaintiff are those cases, because it depends. It depends on who is executing the warrant versus who swears out the false affidavit. If it is the same officer, you can bring a false arrest claim against that officer, because they're the ones that know it is false, it is false as to them. If an officer swears out a false affidavit, and the magistrate or the judge doesn't know it's false, and they issue a warrant, and then it's given to a different set of officers to execute the warrant, it is a facially valid warrant as to those officers. Agreed, agreed. But your claim is against the officer for malicious prosecution. Your claim is not against the sort of, well, I guess those are a little different when it's an arrest warrant. But your claim wouldn't be against the city, it would be against the officer who lied, even in the case of an arrest warrant. You couldn't sue the officers for false imprisonment individually under state law? Yes, you could sue the officer who lied, if they were the ones who lied and they executed the warrant. And if they're the ones who lied, then they weren't. I'm sorry, so your claim is that at best, they have a claim against the officer who may not have testified accurately, but no one else? Correct, that's Wallace Vecato, United States Supreme Court. No, but that doesn't deal with state law. But it's a malicious prosecution, yes, under state law is a malicious prosecution. I know, but you started out by saying you wanted to talk about the state law claim. Yes, I'm sorry, I'm sorry. That's a Supreme Court case dealing with 1983 and the tort of malicious prosecution. There's a lot of overlap, but it's not exactly the same, or not necessarily the same as a state law claim. It might have different elements. Correct. Do you think it's analogous enough to apply here? There's also many state law cases that I cited. I cited state law cases in my brief. Also, Jackson versus Navarro from the 4th CCA, it's the exact same analysis under the state law, the distinction between malicious prosecution and false imprisonment or false arrest. And it makes the exact same distinction, that once you have a facially valid judicial process, even if there was a lie, that's the basis of that process. So long as the judge is not aware of the lie, it's still facially valid judicial process, and your remedy lies with a malicious prosecution claim against the officers who lied. One of the arguments made by Mr. Smart is that this valid judicial process theory was presented by the city for the first time in its Rule 50B post-trial motion, but was not raised in its Rule 50A motion for judgment as a matter of law. Before we get to any consequence, is that accurate? I do not believe so, no. First of all, to begin with, the standard for preservation of a 50, okay. I'll just go through, I'm going to take you through every time this issue was raised. Well, you can only raise it in the Rule 50A. Well, just because the preservation standard is also about unfair surprise and being ambushed, and they were fully aware of this issue. It was raised in our motion for summary judgment in their response. I know, but people raise things at summary judgment that they then decide for whatever reason, tactical or otherwise, that they're not going to raise at trial. And so the fact that you may have put it in a motion in limine or a motion for summary judgment doesn't answer the question of whether you raised it at a Rule 50A stage. I still believe the city raised it at the Rule 50A. What did you argue at the Rule 50A on that issue? The city's argument was that there shouldn't be a false imprisonment claim because he was held over pursuant to other judicial processes. They mentioned, the trial court counsel mentions the probable cause hearing. He focuses a little bit more on the prosecution, I will admit, than on the probable cause hearing in the 50A oral motion. But he certainly talks about being held over pursuant to the judicial process and says that that severed the actions by the police officers and their initial actions. The trial court, in denying that motion, specifically focuses on the lies at the probable cause hearing. So this has been the focus of this issue the entire case. So the idea that they were unaware of this issue or that this issue wasn't raised or that this somehow came up in the post-trial motion is somewhat absurd. But I will also note that the, I just lost my train of thought, I'm sorry. They weren't prejudiced by it also, and that's one of the standards in the 11th Circuit for the 50B motion. Because this is a pure legal issue, there's no disputed facts. It's not like they would have put on something different. This idea that the officer lied at the probable cause hearing was one of the main focuses of the trial. It's not like, the city wasn't taking a position in the 50B motion that that wasn't true. We were saying accepting that as true, legally, from a just pure legal standpoint, this claim still shouldn't have gone forward. Okay, Ms. Vanuti, thank you very much for answering the questions. We appreciate it. Thank you, and we would ask that you reverse. All right, thank you very much. Mr. Clark. Mr. Clark, we took Mr. Andrews and Ms. McNulty over their time, so if you need more time at the end, we'll give you some. Thank you, Judge. May it please the court. The first point I think we need to deal with is the fact that the trial judge below found that there was a policy. The state's position, or I'm sorry, the city's position appears to be that the only way of establishing the existence of some kind of policy is by prior incidents. They seem to ignore the fact that if you have three police officers that are responsible for the administration of this policy, all of whom say this is the policy. Each of them said, none of them had read the contract. Each of them said the policy is that the first 48 people can follow us around and do anything they want to do as long as they do not interfere with what we're doing. The judge found that there was a policy, that's the policy. For some reason, the city seems to think that when you have testimony of officers, which is unusual, I mean, usually you have to have prior incidences because everyone's claiming something didn't happen. In this case, the officers, all sergeants, the sergeants said, hey, this was the policy. The policy was that they were allowed to follow us around anywhere we went. Did they, when you say that their testimony was that they could do anything they want, did that include, according to their testimony, filming? Yes. As a matter of fact, I think that's touched upon in Sanchez's testimony, where item, with this one section of testimony here, document 107, page 181. Doesn't it concern you at all that you're conducting an investigation with a camera crew next to you taking pictures of everything? Answer, sir, that is what the department, based on the policies, and that is what I had to do. That's what the department's policies would say. They had an agreement with the first 48. I have no control over their agreement with the first 48. Question, so your instructions were to cooperate with first 48, correct? Answer, my instructions, to be filmed. But, I mean, if you take that testimony, all the police officer is saying is that whatever the contract is, is the contract. And if they're abiding by the contract, I don't like it, but I gotta live with it. Doesn't say that, but we knew that they were violating a term of the contract. Your Honor, I think that what they were saying, and I may not have seen the exact same things you're referring to. They're not saying that there was a contract, blah, blah, blah. They said they didn't see the contract. They had no idea what the contract was. They said, this is the policy. This is what we're supposed to do. Each of them testified that they hadn't read the contract. They hadn't had any, there was no training. One of the officers said when he was asked, is there any training on this policy? He laughed and said, training? There's no training. So the policy that they understood, and they all testified about was, that First 48 can follow them around and tape and do whatever it is they wanna do, as long as they do not interfere with the investigative process. That's the policy, and that's the policy that Judge Cook found at the end when she was ruling on the various motions. She said, that's the policy. Was there any evidence at trial that there was filming without the consent of the homeowner or the person who occupied or owned the premises? The evidence of the officers who testified, the officers who testified said that was not necessary. They were allowed to follow them around and tape anything it was that they did. Now, the contract said that they had to get permission to go into a house, but they never did that. And the judge, as you know, directed a verdict on that particular point. But the fact of the matter is that they allowed these cameras to follow them around. There's testimony that the officers gave that the First 48 folks were actually embedded in the homicide unit on the fifth floor of the City of Miami Police Station. That they had the cell phone numbers of all of the police officers, the detectives, and they had their cell phone numbers, and they would alert them when there was a crime. The other thing, Judge, I think that is significant here, they're trying to take the position that the city fathers didn't know it was going on. There were 76 episodes that were taped. In the 2008, I believe it was the 2008 annual report of the police department, which introduces Exhibit 73, they have a picture of all of the detectives in homicide with stars next to their name. These are the stars. They explain in the text that goes along with it that this was designed for a public purpose, okay, to show what was going on in terms of crime and the like. The City of Miami basically was promoting the city through this exercise. And the suggestion that the normal kinds of latitude that we give to police officers who are stuck on the scene of a crime trying to make a decision doesn't apply when you have the city basically promoting itself. That's what they were doing. It was a commercial enterprise, like they're running a parking garage. But they want to have all of the constitutional protections, including some that don't exist. So the fact of the matter is, is that clearly there was a policy. They paid no attention whatsoever. They never got a consent from Mr. Smart. And the various places that they filmed were places that you could not normally, the public was not allowed to go. Judge Cook even asked them at one point in time, she said, well, you mean to tell me that these people could just come to any crime scene normally without this policy and do what they're doing? Said, well, no, no, they couldn't do that. It's because of the existence of the policy. The only other thing, I mean, I think it was adequately briefed, if the court's interested in the argument as far as probable cause is concerned. But they waived that, they waived that argument in their briefs. And then when they came to the motions after trial, what they wanted to do at that point in time was they introduced this new argument. But at the time of the probable cause hearings and at the time that they made their initial motions to the court, they didn't raise these issues. Their argument was- You don't mean the probable cause, you mean the Rule 50 hearing? Yes, Your Honor. But initially, the argument was that whatever probable cause had occurred in the beginning of the bond hearing, and Judge Cueto, who is at the time in Dade County, they had the circuit judges, the active circuit judges hearing bond hearings, because that's the way they were doing it at that point in time. The judge refused to find probable cause on the first appearance. He wanted evidence to show a connection. He said, there's no connection here. They brought in Detective Sanchez, who then lied. He just lied about what happened. And based on that lie was what they were then able to, to retain this young man for 19 months. Mr. Andrews says that, or Ms. McNulty, I'm sorry, says that if there's a claim for false imprisonment based on the holding of Mr. Smart after the probable cause hearing where Mr. Detective Sanchez testified, it's a claim against him or maybe other officers, but not against the city. What is your response? I'm sorry, Your Honor. Under state law, the city's responsible for its employees. One of the points that council, one of the council raised was the outlier case from the fourth district. I think it may have been the second district. That outlier case, they are eerie bound to follow. It's a state law case. So the fact of the matter is, the city is responsible for what its employees do. And this entire thing was basically designed against the pressure of making sure that things were done within 48 hours. And they did it within 48 hours. And within 48 hours, they basically stuck this young man in jail for 19 months for something he had not done. So your state law position, even though there are cases that say state law determines the contours, in this case, it's a state claim, that if somebody misrepresents or intentionally falsifies information to a judicial officer who has responsibility for determining if a warrant is issued, that all you have to do is find that there was a misrepresentation, intentional or unintentional. And the city would be liable if that person was arrested, even though the judicial officer believed and in good faith relied upon the information presented to them. If the judicial officer believed the lies that were presented by the employees of the city, the city is bound for the responsibility for those lies and is bound for the false imprisonment. Not the judge and not the judicial process. The judicial process isn't responsible for the fact that a detective came in and lied to make sure that everything happened within 48 hours, and you, Judge, I think- I'm just, just the law of Florida. If, if a magistrate judge or some judicial officer is presented with information that they accept is true because it's presented to them under oath. And they say that's enough for me to find probable cause on an issue of warrant. If, if it's determined later that the information submitted to the judicial officer was false, the city is liable? I think that's a different point, your honor, for this reason. Generally speaking, when we're looking at probable cause, you have an arrest affidavit, okay? If that arrest affidavit contains information that might not be true, there's a different standard. In this case, the judge looked at the arrest affidavit. He said, hey, there's not enough here for me to find probable cause. I want a hearing. Two days later, they bring in Detective Sanchez, who just comes in and lies. Based on those lies are the reason why this man was detained. Not because of what was in the arrest affidavit, or the initial- Detained because a judicial officer hearing Detective Sanchez says, oh, that's enough information for me to find probable cause. I'm going to issue a warrant to have him detained, right? No, he didn't issue a warrant to have him detained. He kept him in custody. He was in custody already. This wasn't, this is- At that point, there's a judicial determination that there's probable cause to detain him. Judge, I think respectfully that there's a big difference between what happens on on an arrest warrant and what happens when somebody comes into court and lies to a judge. And the Juliet case, the Supreme Court of the United States talked about the fact that you can't rely upon lies to validate a judicial proceeding. And that's what happened here. Those lies are what validated the judicial proceeding. Let me just ask a practical question. The verdict in this case, was it a general verdict or was there a separate verdict on each, on the underlying state law claim in the 1983 claim? The latter, Your Honor. So there were separate verdicts? Yes, Your Honor. We will otherwise rely on our briefs unless the court has any other questions.  Thank you. May it please the court. I'd like to make two points and then cede the rest of my time to Ms. McNulty on this rebuttal. First- I thought she wasn't taking any rebuttal time. Collectively, we were going to. We were dividing the issues and dividing our time. I know, but that's why I asked you at the beginning if I had the- I heard the time. I did. I heard the time and I was- That's okay, you can split your rebuttal time if you'd like. Thank you. Go ahead. The plaintiff's argument, as he just stated, is regarding a policy, was the city's policy to allow access for the first 48. But that wasn't the injury. That's not what they alleged occurred at trial. The injury was the filming. And so the city's policy of, the city's agreement which required the first 48 to get consent before doing any filming, before entering anybody's property, does not constitute deliberate indifference under the United States Supreme Court or this court's precedent. Do you, is there anything of relevance to the fact that, at least in this case, they didn't get consent to enter either? And the testimony of the various police officers, it seems to me, at least could be interpreted to say that, at least with regards to entry, they were just coming in all the time, no questions asked, without consent. I don't believe that there was that specific evidence of that. In this case, perhaps, but one case by itself, one incident, cannot make a policy or a practice or a pervasive custom. And that's what we have- So while police are executing a search warrant, the first 48 is going out there and bringing out the people who own the home and talking to them and saying, hey, by the way, listen, we're a production company. We want to put out this program which shows search warrants being carried out, people being arrested, and right away when it's really fresh and all of that, and we'd like to do that here. So you want to sign this consent form? That's what first 48 is supposed to be doing? Presumably, that is what they are supposed to be doing. And by the way, we can't even go into film unless you give us permission to go in. We've got this camera crew here. We'd like to have access to your house to just go through it and take whatever pictures we'd like. So here's a consent form. You want to sign that too? That's what's presumed by the contract. Correct, because that- On presented any evidence of whether or not those contract provisions were followed or not followed. Correct, I believe it was their burden to do it, but- I know, but my question was- There was no evidence, no. No evidence either way. Correct. How long had this contract been in place by the time that Mr. Smart's arrest took place? There were different iterations of the contract. I believe it was at least a few years. I can't say specifically. Okay. There's no further questions. I'll save the rest of my time to Ms. McNulty. All right, thank you very much, Mr. Andrews. Your Honor, just very briefly, I wanted to address the point made by Mr. Clock that the city is liable if its employees lie at a probable cause hearing under state law. Section 768.28 of the Florida Statutes actually addresses city's municipal governments and the balance between employees and the governmental liability when there's a tort involved. It strikes a balance by allowing injured individuals to sue governmental entities. It shields governmental employees for certain torts that they may commit. And it allows exposure of the governmental entities, but caps it at a certain limit. But it also has a very important point in it, which is that if the governmental employee takes an action that involves malice, then they are then responsible individually, and the responsibility is no longer on the governmental entity. And this is- Did you make that argument at summary judgment? If you were right, you could have gotten out very easily. Admit that Detective Sanchez willfully lied, hang him up on a string, and say, we're out. Did you make that argument at summary judgment? I don't think that exact argument was made. No, of course not. Did you make that? Because you could have gotten out on that theory. You admit that what the officer did was deliberate, willful, unintentional tort, and then you get out. Because you're right that the statute doesn't allow respondee at superior liability for that sort of a tort. But respectfully, it's the same argument as the malicious prosecution argument. Because the argument that you have a malicious prosecution claim against the officer, rather than a false imprisonment claim against the city, it's analogous for the reasoning of this, letting the division of liability in those cases. I think I interrupted Judge Duffy. I'm sorry, Judge Duffy. Did you ask for a jury instruction, asking the jury to determine whether or not there was malice? I don't know. I don't believe so. Because false, and I think what we're both trying to get at is that testimony that turns out to be false need not be intentionally so. It can be the product of a mistake or a faulty memory or deficient investigation or something like that, or it can be something really nefarious where I'm just going to lie. Right. Right? And it can be one of the two. And if your position was that Detective Sanchez might have made a mistake, but he didn't intentionally lie to Judge Cueto, then different cards were on the table for the jury. Right. How was that issue played to the jury in closing argument by you and by the plaintiffs? Well, I mean, he wasn't a defendant, so- Right, but he was a focus of some of the testimony at trial. Right. I mean, I think it was probably downplayed a little bit, less so than saying it was malicious, probably. Okay. All right, Ms. Melty, thank you so much. Thank you. We appreciate the argument on both sides. It was well done. We're in recess until tomorrow morning.